UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ANDREW LEVIN,

        Plaintiff,

                                      **COMPLAINT**

-vs

INSTITUTIONAL INVESTOR, LLC,         **JURY TRIAL DEMANDED**

        Defendant.
-------------------------------------------------------X

## I. INTRODUCTION

1. Plaintiff Andrew Levin brings this employment discrimination action against Defendant Institutional Investor, his former employer. As further demonstrated below, Plaintiff suffered discrimination and retaliation because he requested a reasonable accommodation for his disability, Attention Deficit Disorder.

## II. PARTIES

2. Plaintiff resides in Dutchess County, within this judicial district. At all times relevant to this action, Plaintiff resided in Westchester County.

3. Defendant is a corporation situated in New York County. Defendant is a business-to-business publisher, focused primarily on finance, publishing magazines, newsletters and journals as well as research, directories, books and maps. In addition, Defendant runs conferences, seminars and training courses and provides electronic business information.

## III. JURISDICTION AND VENUE

4. As Plaintiff brings this action pursuant to the Americans with Disabilities Act, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)(4) and 42 U.S.C. § 12101, this Court has subject matter jurisdiction over this case.

1

5. As the claims brought under the New York State and New York City Human Rights Laws derive from the same nucleus of operative facts as the federal claim, this Court has subject matter jurisdiction over them pursuant to 28 U.S.C. § 1367.

6. On or about June 24, 2017, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission. The EEOC issued a right to sue letter on December 4, 2018, which Plaintiff received on December 6, 2018. This case is timely filed in federal court.

## IV. FACTUAL ALLEGATIONS

7. Plaintiff began working for Defendant in March 2003 as a Sales Executive, responsible for selling subscriptions for Defendant's institutional customers. At the time of Plaintiff's termination, he was a Senior Account Manager.

8. In Plaintiff's 14 years of working for Defendant, his reputation of competency and hitting all of his forecasts, (or superseding them) has been commendable, as Plaintiff has received several awards from Defendant, including Global Salesperson of the Year, U.S. Salesperson of the year (on two occasions), and several other quarterly awards. Plaintiff routinely completed his administrative assignments with due diligence and produced all daily goals as instructed.

8. For approximately seven years prior to his termination, Plaintiff reported to David Rowe, who headed U.S. Sales.

9. Plaintiff has attention deficit disorder, a disability under federal, state and city law, which substantially affects the major life activities of concentrating and thinking.

10. On March 7, 2017, Plaintiff gave Nirupa Moonsammy from Human Resources Department a letter from his treating physician regarding Plaintiff's diagnosis of attention deficit

disorder in anticipation of an upcoming move to Defendant's new office space. In the letter, Plaintiff's physician stated Plaintiff has had a longstanding and well-documented history of a disability and recommended that Plaintiff be seated in a low stimulus environment. Plaintiff asked that Moonsammy keep knowledge of his disability confidential from Rowe because, over the course of seven years of working with Rowe, Plaintiff had heard him make jokes about other employees based upon their appearance and mannerisms. Fearing Rowe's jokes and contempt, Plaintiff had previously withheld information about his disability from Defendant.

11. Despite Plaintiff's request to keep knowledge of his disability confidential, on March 10, 2017, Moonsammy provided the letter to Rowe. Five days later, Rowe moved Plaintiff's proposed assigned seat one seat over, which provided no reprieve from the high-stimulus environment of an open-floor plan. When Plaintiff immediately expressed concern to Moonsammy, she told Plaintiff to "wait and see" what happens after the company moved to the new location.

12. During the office move, all employees were required to work from home for one week. However, except for Plaintiff, everyone in his department had an office-sponsored laptop. Although Plaintiff had previously requested a laptop, Rowe had denied that request. When Plaintiff asked the IT department about acquiring an office laptop, he was told that Rowe had discretion whether to approve one. In fact, the company provided a laptop to Plaintiff's partner, who had less seniority, but the same position as Plaintiff. Unlike Plaintiff, his partner was therefore able to complete administrative duties, reports and spreadsheets in transit.

13. On April 19, 2017, Plaintiff met with Rowe regarding his discussion with IT and his refusal to provide Plaintiff with an office laptop. Rowe was angry that Plaintiff had questioned

his decision not to provide him with a laptop. The following day, Plaintiff was singled out for a highly-scrutinized audit by a co-worker who was friendly with Rowe.

14. On April 21, 2017, Plaintiff met with Moonsammy to discuss his request for a reasonable accommodation and the issues that had arisen with Rowe and his recent discriminatory behavior. Plaintiff said that, since disclosing his disability to the company, Rowe was making Plaintiff's work life miserable. Plaintiff asked Moonsammy to find an alternative work arraignment for him and that he feared Rowe's retaliation. While Moonsammy said she would follow up with Rowe and help to find an alternative arrangement, she did not follow up with Plaintiff.

15. Things got worse for Plaintiff. For the next two to three weeks, Rowe launched an aggressive campaign to discredit Plaintiff. Rowe started to withhold information vital to Plaintiff's job, marginalized Plaintiff in the workplace so he could not speak with other managers, tried to turn other managers and coworkers against Plaintiff, and in various cases asked them to closely scrutinize Plaintiff and document it into emails. Rowe also stopped providing Plaintiff with the same resources that others had access to within his department.

16. In addition, Rowe started (1) creating new rules pertaining solely to Plaintiff and (2) enforcing existing rules that in Plaintiff's 14 years he had previously allowed. Rowe also began overseeing and scrutinizing Plaintiff's work in a manner that made it significantly more difficult for Plaintiff to perform his duties.

17. On May 1, 2017, Rowe sent Plaintiff an email entitled "PERFORMANCE WARNING." The basis of this warning was that Rowe was upset that Plaintiff was "questioning him," and he falsely claimed that Plaintiff was acting aggressively in defending himself. While

Rowe claimed he sent this email to HR, Plaintiff never heard anything from that office in this regard.

18. On June 22, 2017, Plaintiff was called into to a meeting with Moonsammy, Rowe and Nicole Figueroa from Finance. In that meeting, Plaintiff was presented with a "Final Warning." Despite Plaintiff's objections that he had done nothing wrong, Rowe attempted to manipulate prior emails, some spanning over the previous five years, to discredit Plaintiff. Rowe omitted context; for example he did not provide additional emails that demonstrated that he had indeed approved many of these transactions. During this meeting, Moonsammy and Figueroa sided with Rowe and refused to listen to Plaintiff's side of the story. Nor was Plaintiff given an opportunity to review the documents and emails that purportedly criticized his performance or to rebut the same with his own documentation. Moreover, the three management participants in this meeting repeatedly tried to minimize and trivialize Plaintiff's claims of harassment and discrimination.

19. The next day, Moonsammy emailed Plaintiff the written warning with the emails provided by Rowe. In response, Plaintiff provided proof in the form of prior emails showing that he was instructed or given permission to facilitate procedures for which he was now being criticized.

20. On July 5, 2017, Plaintiff responded in writing to the accusations that were set forth on June 22. Plaintiff demonstrated that Rowe had personally approved Plaintiff's transactions, but had then changed his position in a manner that suggested Plaintiff had acted contrary to policy.

21. By this point, Rowe was micromanaging Plaintiff such that he required daily spreadsheets, a weekly report, as well as a second report (if Plaintiff superseded his work

targets), a monthly net spreadsheet, a bi-monthly meetings, a monthly audit, an updated group account spreadsheet, an updated contract folder, all monthly manual claims, weekly feedback throughout the week in addition to a host of ad hoc assignments. All aspects of Plaintiff's job for more than 14 years were now being closely monitored.

22. When Plaintiff told Rowe that he did not understand his new work rules, Rowe declined to elaborate and responded with smirks, sarcastic comments relating to Plaintiff's intelligence, and laughter. Plaintiff told Rowe that his new rules were not reasonable and that, since he gave Plaintiff the highest target in the Department, his new rules would prevent Plaintiff from achieving his target and disallow Plaintiff the time or resources that he needed to provide customer service support that he had been able to previously provide.

23. At this time, Plaintiff also told Rowe that after he had disclosed his disability and requested a laptop, he began treating Plaintiff with increased hostility, and that the seat to which he moved Plaintiff was in the loudest location in the office, making it difficult for Plaintiff to function. Rowe told Plaintiff not to contact Human Resources and he would deal with this issue; in fact, Rowe did not address this issue. Plaintiff reported that without a laptop computer (which almost everyone had) he was unable to leave his desk and utilize any of the quiet locations.

24. In addition, Rowe began to approve "requested sales claims" for Plaintiff's partner, but highly scrutinized and rejected Plaintiff's claims. As a result of Rowe's influence, co-workers -- including his Product Manager -- stopped talking with him.

25. On August 22, 2017, Plaintiff sent an email to the CFO of the company. Plaintiff told him that he was being discriminated against and asked to speak with him. While the CFO acknowledged receiving the email, he did not follow up with Plaintiff.

26. On August 30, 2017, right after Plaintiff sent an email to Rowe regarding his new workplace policies, he was called into Human Resources, where Moonsammy said that, as per Rowe, she was terminating Plaintiff's employment because of a customer complaint for which she would not elaborate. Plaintiff told Moonsammy that, in the course of bringing in $1.2 million for the company on an annual basis, he had thousands of customers over the course of his 14 years with the company. Moonsammy refused to show Plaintiff the paperwork that purportedly supported her reason for terminating his employment and rudely told Plaintiff to "get out."

27. Despite his best efforts, Plaintiff has been unable to find comparable work since his unlawful termination.

28. As a result of Plaintiff's termination, he has sustained pain and suffering, embarrassment and humiliation.

### V. CAUSES OF ACTION

29. Plaintiff incorporates the allegations above as if restated herein.

30. In denying Plaintiff a reasonable accommodation, Defendant violated the Americans with Disabilities Act and the New York State and New York City Human Rights Laws.

31. In terminating Plaintiff's longtime employment because he requested a reasonable accommodation and protested the unlawful discrimination, Defendant violated the Americans with Disabilities Act and the New York State and New York City Human Rights Laws.

WHEREFORE, Plaintiff prays that this Honorable Court:

a. accept jurisdiction over this case;

b. empanel a jury to hear and decide this case;

c. award to Plaintiff back and front pay for his lost wages resulting from his unlawful termination;

d. award to Plaintiff damages for pain and suffering;

e. award to Plaintiff punitive damages for the violation of his rights under federal and city law;

f. award to Plaintiff attorneys' fees for the work expended in prosecuting his claims under federal and city law; and

g. order any other relief deemed just and proper.

Dated: February 26, 2019

Respectfully submitted,

*/s/ Steph B___*

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277
Counsel for Plaintiff